**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

RAVAGO AMERICAS LLC, a
Delaware limited liability company,

               Plaintiff,                     CASE NO: 6:18-cv-1584-ORL-41-KRS

v.

VINMAR INTERNATIONAL, LTD.,
a Cayman Island limited company;
PREMIER POLYMERS, LLC, a Texas
limited liability company; VINMAR
POLYMERS AMERICA, LLC, a Texas
limited liability company; JEFFREY S.
SIEBENALLER, an individual; KIRT
DMYTRUK, an individual; and JOHN
WARD, an individual

               Defendants,

_____/

## FIRST AMENDED COMPLAINT

The plaintiff, Ravago Americas LLC ("Ravago"), through the undersigned counsel, sues

the defendants, Vinmar International, Ltd. ("Vinmar"), Premier Polymers, LLC ("Premier"),

Vinmar Polymers America, LLC ("VPA"), Jeffrey S. Siebenaller ("Mr. Siebenaller"), Kirt

Dmytruk ("Mr. Dmytruk"), and John Ward ("Mr. Ward") (collectively, the "defendants"), and

states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     The plaintiff, Ravago, is a Delaware limited liability company that, at all times

material hereto, was authorized to and did conduct business in the state of Florida. Ravago's

principal place of business is located at 1900 Summit Tower Boulevard, Suite 900, Orlando,

Florida 32810.

2.     Defendant Vinmar is a Cayman Island limited company that, at all times material hereto, conducted business in the state of Florida. Vinmar's principal place of business is located at 16825 Northchase Drive, Suite 1400, Houston, Texas 77060. Vinmar attends yearly trade shows in Orlando, Florida, has clients in Florida, and regularly conducts other business in Florida. Additionally, Vinmar's wrongful actions, as alleged below, were directed at Florida and took place in Florida. Vinmar's activities in Florida were crucial to its success in misappropriating Ravago's trade secrets. Specifically, Vinmar solicited Mr. Dmytruk and Mr. Siebenaller while both were located in Florida. It used each of the individual defendants, as agents, to misappropriate Ravago's trade secrets in Florida, thus harming Ravago in Florida. Accordingly, Vinmar committed a tortious act within the state by misappropriating Ravago's trade secrets. Moreover, the harm to Ravago caused by Vinmar is felt primarily – if not exclusively – in Florida.

3.     Defendant Premier is a Texas limited liability company that, at all times material hereto, conducted business in the state of Florida. Premier's principal place of business is located at 16825 Northchase Drive, Suite 1300, Houston, Texas 77060. Premier is a wholly owned subsidiary of Vinmar and VPA. Premier has a distribution center in Florida, attends yearly trade shows in Orlando, Florida, and regularly conducts other business in Florida. Moreover, Premier has reached into Florida to contact at least one of Ravago's customers, Prime Molding Technologies. Premier reached out to the owner of Prime Molding Technologies and his daughter about doing business with Premier. Premier also has its own clients in Florida. Premier's wrongful actions, as alleged more specifically below, were directed at Florida and took place in Florida. Premier's activities in Florida were crucial to its success in misappropriating Ravago's trade secrets.

2

4.     Defendant VPA is a Texas limited liability company that, at all times material hereto, conducted business in the state of Florida. VPA's principal place of business is located at 16825 Northchase Drive, Houston, Texas 77060. VPA's wrongful actions, as alleged below, were directed at Florida. VPA used each of the individual defendants to Ravago's trade secrets in Florida. Indeed, Ravago's trade secrets, stolen from Florida, were used to set up VPA's business. VPA's activities in Florida were crucial to its success in misappropriating Ravago's trade secrets. VPA committed a tortious act within the state by misappropriating Ravago's trade secrets. Moreover, the harm to Ravago caused by VPA is felt primarily in Florida.

5.     Defendant Siebenaller is a resident of Seminole County, Florida. Mr. Siebenaller acted as Vinmar's, Premier's, and VPA's agent in misappropriating Ravago's trade secrets. Moreover, Mr. Siebenaller continues to work as a sales consultant and solicit Ravago employees, for Vinmar, Premier, and VPA. Mr. Siebenaller committed a tortious act within the state by misappropriating Ravago's trade secrets.

6.     Defendant Mr. Dmytruk owns a home in Seminole County, Florida, where he resided during his employment with Ravago. It is unclear where he currently resides, but Ravago believes that he is temporarily staying at a hotel in Houston, Texas. Mr. Dmytruk acted as Vinmar's, Premier's, and VPA's agent in misappropriating Ravago's trade secrets. Indeed, Mr. Dmytruk was working for Vinmar and Premier to establish VPA, using Ravago's trade secrets, while living in Florida and working for Ravago. Mr. Dmytruk committed a tortious act within the state by misappropriating Ravago's trade secrets.

7.     Defendant Ward is a resident of Summit County, Ohio. Mr. Ward conducts business in Florida, including attending the same yearly trade shows as Vinmar, Premier, and VPA, and attending senior management meetings at Ravago's headquarters in Orlando, Florida.

3

While at senior management meetings in Orlando, Florida, Mr. Ward was given access to Ravago's trade secrets. Mr. Ward disclosed that information to Vinmar, Premier, and VPA. Notably, Mr. Ward was at the same trade shows as Vinmar, Premier, and VPA in Florida. Mr. Ward's activities in Florida were crucial to his success in misappropriating Ravago's trade secrets. Mr. Ward committed a tortious act within the state by misappropriating Ravago's trade secrets. The harm to Ravago caused by Mr. Ward is felt primarily in Florida.

8.      Mr. Dmytruk's initial disclosure of Ravago's trade secrets to Vinmar, Premier, and VPA occurred while he was still living in Florida and working for Ravago. Mr. Siebenaller's disclosure of Ravago's trade secrets to Vinmar, Premier, and VPA occurred, and continues to occur, in Florida.

9.      This Court has jurisdiction over the defendants pursuant to Florida's long arm statute. Florida's long arm statute provides, in pertinent part: "[a]ny person, whether or not a citizen or resident of this state, *who personally or through an agent* does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts: . . . 1. [o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state . . . or 2. [c]ommitting a tortious act within this state. . ." § 48.193(1)(a), *Fla. Stat.*(emphasis added).

10.      Moreover, Florida's long arm statute states that a "defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." § 48.193(2), *Fla. Stat.*

11.     Each of the defendants committed an intentional tort that was directly aimed at Florida and caused injury in Florida that they should have reasonably anticipated. Thus, each defendant is subject to the specific jurisdiction of this Court. Florida has a special interest in exercising jurisdiction over defendants who commit intentional torts that cause injury to Florida residents, such as Ravago.

12.     Exercising jurisdiction also comports with the requirements of due process. The defendants' contacts with Florida are related to Ravago's claims for relief. Additionally, intentional tortious conduct is aimed at the forum state where it is directed at a resident of that state. Here, the defendants' intentional tortious conduct was aimed at Ravago, which resides in Florida, and the brunt of the harm was felt in Florida. The Court's exercise of jurisdiction over the defendants comports with fair play and substantial justice. The United States Supreme Court has indicated that, in the case of intentional misconduct, a plaintiff should not generally be required to travel to the defendants' state of residence to obtain relief. The defendants reached into Florida to misappropriate Ravago's trade secrets. Therefore, this Court is the appropriate forum to address Ravago's claims.

13.     Vinmar and Premier were in communications for more than a year with Mr. Dmytruk and Mr. Siebenaller. A Vinmar executive spoke to Mr. Dmytruk for an hour and a half immediately after Mr. Dmytruk attended a Ravago executive board meeting where trade secrets were disclosed. Vinmar and Premier worked closely with, and used the information gained from, Mr. Dmytruk and Mr. Siebenaller to establish VPA – which is modeled after Ravago's most successful division. Make no mistake, this was a coordinated and targeted attack directed at Florida and one of its entities – Ravago.

14.     Accordingly, the Court has specific jurisdiction over each of the defendants due to their misappropriation of Ravago's trade secrets in Florida. Additionally, the defendants are subject to specific jurisdiction pursuant to Ravago's civil conspiracy claim. Florida's long arm statute supports personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy. As detailed significantly throughout this pleading, each of the defendants committed tortious acts in Florida.

15.     The Court also has general jurisdiction over Mr. Dmytruk, Mr. Siebenaller, Premier, Vinmar, and VPA. Mr. Dmytruk is domiciled in Florida and worked for Ravago in Central Florida. Indeed, Mr. Dmytruk still owns a home in Florida. That home is listed as his homestead and receives homestead tax exemptions. To the best of Ravago's knowledge, Mr. Dmytruk's domicile has not changed, as he has not established an intention to permanently leave Florida. Mr. Siebenaller currently lives in Florida. Premier does extensive business in Florida. Premier has a distribution center in Florida, employees in Florida, and a large client presence in Florida such that Premier is essentially at home in Florida. Indeed, for just one of its clients in Florida – Trujillo and Sons – Premier distributes over ten million pounds of resin per year from its Florida distribution center. Premier is an agent through which Vinmar and VPA conduct business in Florida. Vinmar's, Premier's, and VPA's separate corporate status is formal only. Indeed, Vinmar, Premier, and VPA share managers, employees, and a home office in Houston, Texas. They all operate under the "Vinmar Group." Premier functions only to achieve the purposes of Vinmar and VPA (whose sole purpose is to act for Vinmar). Thus, Premier's contacts in Florida can be imputed to Vinmar and VPA.

16.     This is an action for injunctive relief and damages arising from the defendants' violation of the Defense of Trade Secrets Act, 18 U.S.C. § 1836, Florida's Uniform Trade

Secrets Act, breach of fiduciary duty, breach of non-solicit and confidentiality agreements, tortious interference, and civil conspiracy.

17.     The Court has original jurisdiction under 28 U.S.C. § 1331 because this action contains claims that arise under federal law. The Court has supplemental jurisdiction over the non-federal claims under 28 U.S.C. § 1367 because such claims form part of the same case and controversy.

18.     Venue is proper in the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred here and because two of the defendants resided in the district at the time the claims accrued.

19.     Ravago has retained the undersigned law firm and has agreed to pay it a reasonable attorney fee for its services related to this action.

20.     All conditions precedent to this action have occurred or have been waived.

## RAVAGO'S BUSINESS AND TRADE SECRETS

21.     Ravago is the principal operating company in the Americas for the Ravago Group. Ravago Group was founded in 1961 in Arendonk, Belgium. Ravago Group is a world-wide leader in the global market of plastics, rubber, and chemicals. Ravago Group, including Ravago, is a private entity that is not required to disclose its financials or other confidential information in the way that a publicly traded company is required.

22.     Ravago distributes, resells, and compounds a wide range of plastic and rubber materials ranging from high performance engineered resins to recycled post-consumer materials. Ravago has developed a highly confidential strategy to both source and supply resins to customers and provide resin manufacturers with an outlet for resin. None of Ravago's competitors have access to its business model. This business model includes a broad range of

business methods, strategies, and systems, including, without limitation, financing strategies, logistics, credit strategies, purchasing strategies, pricing strategies, and a broad portfolio of customer lists.

23.     For example, Ravago uses highly customized software that is integral to its business. This software allows Ravago to maintain highly confidential information regarding its business, including, without limitation, customer lists, product availability, timelines, revenues, expenses and profits. Ravago also created its own highly proprietary and confidential in-house reporting software. This software gives access to the transactional history of the company and its customer's buying patterns.

24.     Ravago has also created a proprietary method to assess and manage credit risk. This method allows it to manage high accounts receivable and better service its customers. Similar to the systems described above, Ravago uses heavily customized software to assess and consider risk for the management of credit. Being able to manage risk is a huge competitive advantage for Ravago.

25.     As part of its business, Ravago has pioneered and mastered the ability to set up multiple channels for its resin manufacturer customers to sell their product. Ravago employs this business model to be able to provide its services to a diverse portfolio of resin manufacturers. Ravago's confidential and proprietary business model allows it to maintain a competitive advantage over its competitors.

26.     The aforementioned business models, methods, and strategies are closely guarded even within the company. The disclosure of such business models, methods, and strategies would be highly valuable to a competitor who could copy such models, methods, and strategies to target Ravago's customers. Ravago has also developed valuable, proprietary, and confidential

information that would enable a competitor to more effectively target those customers by understanding their needs. Such information includes the features and specifications of the software that Ravago has highly customized and tailored, as well as terms of the agreements between Ravago and its customers. The full list of Ravago's customers is maintained in a database to which very few people at the company have access. Indeed, the individual divisions at Ravago are not able to access the customers of other Ravago divisions.

27.     Ravago also maintains valuable, proprietary, and confidential information about its sales strategy and pricing methodology. Such information includes competitive research and strategies for market differentiation, product implementation, deployment strategy, and price lists. Ravago hires its own in-house investment bankers to research and monitor the markets in which it conducts business. The disclosure of this information would enable a competitor to more effectively target Ravago's customers and potential customers by positioning itself favorably in direct comparison to Ravago.

28.     Ravago's trade secrets include financial, business, scientific, technical, economic, and engineering information, including patterns, plans, compilations, program devices, processes, procedures, and programs. Ravago has taken reasonable steps to keep its trade secrets confidential. Moreover, its trade secrets are not known or easily ascertainable by another person or entity who could obtain independent economic value from its disclosure. Ravago also retains independent economic value by keeping its trade secrets confidential.

29.     The individual defendants, through their specific positions at Ravago, were privy to Ravago's computer systems, management presentations, proprietary business models, methods, strategies, strategic documents, systems software, proprietary methods to assess and manage credit risk, financial results, financing strategy, sourcing information, information

related to Ravago's supply chain, customer and supplier lists, and other confidential information constituting trade secrets. More simply put, they were privy to Ravago's most valuable trade secrets.

30.     The individual defendants were privy to certain programs, methods, techniques, and processes that are highly valuable to Ravago because they are not generally known to, or easily ascertainable by, third parties who could obtain economic value from the disclosure or use of such information. These third parties include Ravago's competitors.

31.     Ravago takes the protection of its trade secrets very seriously. Ravago takes reasonable steps to protect this information from disclosure or use by third parties. These measures include, by way of example, strict limitations on the dissemination of information on a need-to-know basis, the use of non-solicit and confidentiality agreements, the use of non-disclosure agreements, and the deployment of private databases to house the information.

32.     Ravago's information is a corporate asset and it has policies and procedures in place to protect against all forms of unauthorized access, use, and disclosure. Ravago requires that all devices containing company information, as well as physical copies of such information, be returned upon each employee's departure. Ravago also employs layers of physical protection at its work sites, including facility access controls. Despite Ravago's reasonable efforts to prevent disclosure, the individual defendants disclosed trade secrets and confidential information to Ravago's direct competitors, Vinmar and Premier – who used such trade secrets and confidential information to establish VPA. VPA now operates using Ravago's trade secrets and confidential information.

33.     Ravago's trade secrets provide Ravago with independent economic value, are lawfully owned by Ravago, and are related to products and services that are used in interstate and foreign commerce.

## VINMAR, PREMIER, VPA AND THE INDIVIDUAL DEFENDANTS

34.     Vinmar was founded in the late 1970's and is Ravago's competitor on a nationwide and global scale. Like Ravago, Vinmar is in the business of distributing and reselling plastics and chemicals. Vinmar has pursued a growth strategy centered on mimicking Ravago's business model and practices, stealing Ravago's talent and trade secrets, and attempting to lure Ravago's customers and prospects. Vinmar is based in Houston, Texas.

35.     Premier is a wholly owned subsidiary of Vinmar and VPA. Vinmar's operations in North America run through VPA and Premier. VPA was established in July 2018. Mr. Dmytruk is the president of VPA and helped establish VPA using Ravago's trade secrets and confidential information while still working for Ravago.

36.     Mr. Dmytruk began his employment with Ravago in 2006 when it acquired Muehlstein Administrative Services, LLC ("Muehlstein"). He previously worked for Muehlstein for a number of years.

37.     Mr. Dmytruk executed a Non-Solicitation and Confidentiality Agreement on May 15, 2006. A copy is attached as **Exhibit "A."** The agreement was acquired by Ravago when it acquired Muehlstein's stock in 2006.

38.     Mr. Dmytruk held several positions in the Ravago organization. Most recently, he was employed by Ravago as the vice president of its manufactured products arm until his abrupt departure on August 9, 2018. Four days later, Mr. Dmytruk was unveiled as a president of the

11

brand new polymer arm of Vinmar – VPA. He reports to the senior vice president of Vinmar – Vishal Goradia.

39.     Mr. Siebenaller began his employment with Ravago in 2009 as a senior account manager. In 2014, he was promoted to Business Development Manager Polypropylene at Ravago. Mr. Siebenaller reported directly to Mr. Dmytruk in both roles.

40.     On September 5, 2009, Mr. Siebenaller executed a Trade Secrets and Confidential Information Agreement. A copy is attached as **Exhibit "B."**

41.     Mr. Siebenaller "retired" from Ravago on July 13, 2018. Prior to his retirement, he asked Ravago's IT department to transfer all of his telephone contacts to his personal telephone. Shortly after his retirement from Ravago, he began working for the Vinmar Group as a sales consultant under Mr. Dmytruk. Both Mr. Dmytruk[1] and Mr. Siebenaller are domiciled in Florida and have conducted extensive business in Florida – including working at Ravago's headquarters in Orlando, Florida.

42.     Mr. Ward began his employment with Muehlstein in February 1995 as a distribution coordinator in Toronto. In 2000, Mr. Ward became Product Manager of Polypropylene and relocated to the United States to support Muehlstein's sales efforts in new account development in Canada, the Midwest, and the West Coast. As mentioned above, Ravago acquired Muehlstein in 2006. Since then, Mr. Ward has held several product management positions at Ravago. Most recently, he was appointed to the position of Market Manager for the Midwest and West Coast where he directly managed key clients.

---

[1] There is no evidence that Mr. Dmytruk has changed his domicile to Texas.

43.     On June 10, 2005, Mr. Ward executed a Non-Solicitation and Confidentiality Agreement in connection with his employment. A copy is attached as **Exhibit "C."** The agreement was acquired by Ravago when it acquired Muehlstein's stock in 2006.

44.     Mr. Ward abruptly left Ravago on September 14, 2018. Mr. Ward, like Mr. Dmytruk and Mr. Siebenaller, now works for the Vinmar Group as the Commercial Director for Durables. Mr. Ward resides in Ohio, however, throughout his employment with Ravago he attended trade shows and senior management meetings in Orlando, Florida. The most recent trade show and senior management meeting Mr. Ward attended in Orlando, Florida, took place in May 2018. Like the other defendants, Mr. Ward's tortious acts were directed at Florida and caused injury in Florida. Mr. Ward, in direct violation of his Non-Solicitation and Competition Agreement with Ravago, destroyed the contents of his work issued computer prior to quitting his job and joining Mr. Dmytruk and Mr. Siebenaller at the Vinmar Group. Ravago hired a forensic analyst who confirmed that Mr. Ward purchased software to permanently erase the contents, including Ravago documents, off of his computer.

## THE RELATIONSHIP BETWEEN THE DEFENDANTS

45.     As early as June 9, 2017, Mr. Siebenaller and Mr. Dmytruk began corresponding with Vinmar's president, Hemant Goradia, Vinmar's senior vice president, Vishal Goradia, and Vinmar's vice president, Kevin Page, through e-mails and telephone calls. Mr. Siebenaller was Mr. Dmytruk's connection to the Vinmar Group. Mr. Siebenaller was trying to set up a meeting for the Vinmar executives to meet Mr. Dmytruk. The parties agreed to meet on September 21, 2017, in Houston, Texas. A copy of representative e-mails are attached as **Composite Exhibit "D"** and the telephone records are attached as **Exhibit "E."** The above-named executives acted through Vinmar and, its wholly owned subsidiary, Premier, to establish VPA.

13

46.     On September 21, 2017, Mr. Siebenaller and Mr. Dmytruk flew to Houston, Texas, to meet with Vinmar's president. The meetings took place on September 21, 2017, at Vinmar's headquarters and a restaurant called Via Emilia. A copy of Mr. Siebenaller and Mr. Dmytruk's travel information is attached as **Composite Exhibit "F."**

47.     Between June 2017 and December 2017, Mr. Siebenaller and Mr. Dmytruk, while in Florida, had several telephone calls with Vinmar – including a November phone call that lasted over an hour. **Exhibit "E."**  It was during this time that Mr. Siebenaller, Mr. Dmytruk, and Vinmar agreed to an arrangement where Mr. Siebenaller and Mr. Dmytruk would work for Vinmar and Premier to establish and operate VPA. There are no circumstances under which Mr. Siebenaller and Mr. Dmytruk, while acting for Ravago, would have had regular business communications with Vinmar's president.

48.     At the end of November 2017, Mr. Siebenaller and Mr. Dmytruk exchanged e-mails regarding Mr. H. Goradia. In one such e-mail, Mr. Dmytruk told Mr. Siebenaller that Mr. H. Goradia wanted to meet with him in December. In response, Mr. Siebenaller asked Mr. Dmytruk if he was still in talks with Mr. H. Goradia, "OTR [off the record] of course." A copy of the e-mails are attached as **Exhibit "G."**

49.     On or before December 7, 2017, Mr. Dmytruk received an offer from the Vinmar Group. He relayed this offer to a fellow Ravago employee. He told the employee that he was not going to accept the offer. In February 2018, however, Mr. Dmytruk resumed communications with the Vinmar Group.

50.     On March 27, 2018, Mr. Dmytruk flew to Houston and stayed at a hotel located near the Vinmar Group's corporate headquarters. A copy of the flight and hotel information is attached as **Composite Exhibit "H."** The next day, Mr. Dmytruk accepted a promotion from

14

Ravago and became the vice president of Ravago Manufacturing Americas. This promotion made Mr. Dmytruk an executive at Ravago – giving him access to more of Ravago's trade secrets and confidential information. This promotion also secured him a seat at Ravago's executive only global board meeting. Shortly after accepting his promotion at Ravago, Mr. Dmytruk continued to communicate with Vinmar's president, Mr. H. Goradia.

51.     On April 18, 2018, Mr. H. Goradia – president of Vinmar – e-mailed Mr. Siebenaller to tell him that retirement was outdated. Mr. Siebenaller responded that he hears "the voices saying perhaps the spelling is 're-hiremont.'" This was approximately seven weeks before his official retirement from Ravago. Mr. Siebenaller, amazed by this e-mail, forwarded a copy of the e-mail to Mr. Dmytruk. A copy of the e-mail correspondence is attached as **Exhibit "I."**

52.     Meanwhile, Mr. Dmytruk continued his communications with the Vinmar Group, despite having just accepted a position as vice president within Ravago's organization. On June 18, 2018, Mr. Dmytruk, along with all of Ravago's top executives and senior leadership, met in Boston, Massachusetts, for Ravago's annual board and business strategy meeting. In addition to Ravago's own executives and leadership, the meeting included the chief executive officer of the Ravago Group, along with several of the European board members and executives. The meeting, which started on June 18, 2018, and ended on June 20, 2018, included the discussion of high-level, highly confidential trade secrets and other proprietary business information. Mr. Dmytruk was seen taking pictures of the presentation on his iPhone. Shortly after the board meeting ended, Mr. Dmytruk had an hour and a half telephone conversation with Vinmar's president – Mr. H. Goradia. **Exhibit "E."** Less than a month later, VPA was formed using Ravago's trade secrets.

53.     Following the board meeting, and until he quit his job at Ravago, Mr. Dmytruk conducted several internet searches on how to erase documents from his MacBook Pro computer and how to delete photographs from his iPhone. During this time, he became very elusive and difficult to reach. Mr. Dmytruk failed to return telephone calls and missed important meetings with all levels of personnel including the chief executive officer of Ravago. In short, he stopped performing his duties as a vice president within the organization.

54.     Despite his elusiveness, however, Mr. Dmytruk was in constant communication with Mr. Ward. Mr. Ward and Mr. Dmytruk had approximately 480 minutes of telephone conversations from June 8, 2018, to July 23, 2018. These communications are uncharacteristic of the ordinary course of dealing between Mr. Ward and Mr. Dmytruk and are indicative of what was going on – their collusion and plan to move to the Vinmar Group.

55.     Before Mr. Dmytruk, Mr. Siebenaller, and Mr. Ward left Ravago, the defendants formed an agreement to misappropriate Ravago's trade secrets, to breach the individual defendants' fiduciary duties to Ravago, and to use Ravago's trade secrets and confidential information to establish VPA – an entity that is modeled after Ravago and that employs both Mr. Dmytruk and Mr. Ward, and uses Mr. Siebenaller as a consultant.

56.     As mentioned above, Mr. Dmytruk left Ravago on August 7, 2018. He returned his computer and cell phone on his last day at Ravago. Prior to returning his cell phone, he deleted all of his text messages with Mr. Ward and Mr. Siebenaller.

57.     A few days later, he was announced as the president of VPA. Vinmar and Premier, with the individual defendants' help and while Mr. Dmytruk and Mr. Siebenaller were still living in Florida and working for Ravago, set up a second channel to operate its business. Before the Vinmar Group opened this new division, Ravago was the only company in the

16

marketplace to employ such a strategy. The only way the Vinmar Group could've opened this new division so quickly is by misappropriating Ravago's trade secrets and by working with the individual defendants while they were still employed by Ravago.

58.     Mr. Ward quit his job at Ravago on September 17, 2018. Previously, on January 10, 2018, Mr. Ward had called the IT department at Ravago and asked them to release his telephone number from Ravago so he could transfer it to another telephone service provider. A copy of the IT ticket is attached as **Exhibit "J."** He is now employed by the Vinmar Group. Mr. Siebenaller also works for the Vinmar Group.

59.     Additionally, in early September 2018, Mr. Siebenaller called a Ravago credit manager and told her to call Mr. Dmytruk. The defendants have continued to solicit employees in a further attempt to misappropriate Ravago's trade secrets and confidential information.

60.     The solicitation of Ravago employees is also in contravention of the individual defendants' agreements with Ravago.

61.     Indeed, Daniel Peretz, a Ravago business manager, gave notice of his resignation on October 9, 2018. He informed management that he was going to work for the Vinmar Group. While at Ravago, Mr. Peretz worked closely with Mr. Dmytruk and Mr. Ward. Mr. Ward was his first boss. Moreover, a review of Ravago's September 2018 telephone records reveals that Mr. Dmytruk, Mr. Ward, Mr. Siebenaller, and the Vinmar Group have contacted several Ravago employees. A copy of the September 2018 telephone records are attached as **Exhibit "K."**

62.     Ravago anticipates further attacks by the Vinmar Group and the individual defendants, including continued illegal disclosure and use of its trade secrets in an effort to take customers and copy its business model, as well as encouraging current Ravago employees to join the Vinmar Group and disclose additional trade secrets and confidential information.

63.     The Vinmar Group has acquired, derived knowledge of, and used Ravago's trade secrets through improper means, including without limitation, bribing employees of Ravago, including Mr. Dmytruk, Mr. Siebenaller, and Mr. Ward, by offering them jobs in exchange for information. The individual defendants have disclosed and used Ravago's trade secrets without Ravago's consent. An additional description of Ravago's trade secrets and the attacks on Ravago by the defendants are found in the first and second declarations of Mr. James Duffy, Ravago's president, attached as **Composite Exhibit "L."**

64.     Additionally, the Vinmar Group was aware of the individual defendants' confidentiality obligations to Ravago. Despite this knowledge, the Vinmar Group has caused and induced the individual defendants to breach their confidentiality obligations by employing them to assist in developing systems nearly identical to the systems they oversaw at Ravago and to assist them in poaching Ravago's customers through the improper use of Ravago's customer lists.

65.     Ravago became aware of the defendants' conspiracy, upon an internal investigation, shortly after Mr. Dmytruk and Mr. Siebenaller's departure.

<u>**COUNT I**</u>
**MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836, et. seq.**
**AGAINST ALL OF THE DEFENDANTS**

66.     Ravago incorporates paragraphs one through thirty-six, thirty-eight through thirty-nine, forty-one through forty-two, forty-four through fifty-nine, and sixty-one through sixty-five.

67.     This is an action for damages and injunctive relief under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

68.     Ravago owns and possesses certain trade secrets. These trade secrets include business models, methods, strategies, systems, financing strategies, logistics, credit strategies,

purchasing strategies, pricing strategies, and a broad portfolio of customer lists, more particularly described above.

69.     Ravago's trade secrets relate to products and services used, sold, shipped, and ordered in interstate and foreign commerce.

70.     Ravago has taken reasonable measures to keep such information secret and confidential. These measures include, by way of example, strict limitations on the dissemination of information on a need-to-know basis, the use of non-solicit and confidentiality agreements, the use of non-disclosure agreements, and the deployment of private databases to house the information.

71.     As a result of these security measures, Ravago's confidential and proprietary trade secret information is not available to, or easily ascertainable through proper means by, any third party, including the Vinmar Group.

72.     Ravago's confidential and proprietary trade secret information derives independent economic value from not being generally known to, or easily ascertainable by, another person who could obtain economic value from the disclosure of use of the information.

73.     In violation of Ravago's rights, the defendants misappropriated Ravago's confidential and proprietary trade secret information in the improper and unlawful manner described above. The defendants' misappropriation of Ravago's trade secrets was intentional, willful, and malicious. The defendants have attempted and continue to attempt to conceal their misappropriation.

74.     The individual defendants, through their employment at Ravago, acquired and had access to Ravago's trade secrets. The individual defendants were obligated by contract and applicable law to refrain from disclosing or using Ravago's trade secrets. The Vinmar Group,

and the individual defendants, knew that the individual defendants were subject to the duty to maintain the secrecy of Ravago's trade secrets. Nonetheless, the Vinmar Group and the individual defendants misappropriated and used Ravago's trade secrets for their benefit by acquiring them through improper means for use in competing with Ravago.

75.     As a direct and proximate result of the defendants' conduct, Ravago has been damaged – and if the defendants' conduct is not stopped, Ravago will continue to suffer severe competitive harm, irreparable injury, and significant damages.

76.     In addition to causing Ravago to suffer monetary damages, the defendants have caused Ravago to suffer damages for which it has no adequate remedy at law to protect it from the unlawful and continuing misappropriation, disclosure, or use of its trade secrets.

77.     Ravago has a substantial likelihood of success on the merits of this claim because of the defendants' misappropriation, disclosure, and use of Ravago's trade secrets.

78.     The threat of harm to Ravago in the absence of injunctive relief far outweighs the threat of harm to the defendants if an injunction is granted. Ravago faces substantial financial loss, loss of goodwill, and loss of its competitive position in the marketplace, whereas the only "hardship" imposed on the defendants would be to prevent them from reaping any illicit gain or benefit from the misappropriation, disclosure, and use of Ravago's trade secrets.

79.     The public interest would be served by granting the relief sought in that the public clearly favors preventing parties, such as the defendants, from profiting from unlawful and improper conduct.

WHEREFORE, Ravago respectfully requests judgment against the defendants as follows: (a) temporarily and permanently enjoining the defendants from using or disclosing any of Ravago's trade secrets; (b) awarding Ravago compensatory damages, including both actual loss

and unjust enrichment, in an amount to be proven at trial, plus exemplary damages for the willful and malicious misappropriation; (c) awarding Ravago its attorneys' fees, costs, and pre and post judgment interest; and (d) granting such other relief as the Court deems just.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS UNDER**
**FLORIDA'S UNIFORM TRADE SECRETS ACT**
**AGAINST ALL OF THE DEFENDANTS**

80.    Ravago incorporates paragraphs one through thirty-six, thirty-eight through thirty-nine, forty-one through forty-two, forty-four through fifty-nine, and sixty-one through sixty-five.

81.    This is an action for damages and injunctive relief under the Florida Uniform Trade Secrets Act ("FUTSA"), chapter 688, Florida Statutes.

82.    Ravago owns and possesses certain trade secrets. These trade secrets include business models, methods, strategies, systems, financing strategies, logistics, credit strategies, purchasing strategies, pricing strategies, and a broad portfolio of customer lists, more particularly described above.

83.    Ravago has taken reasonable measures to keep such information secret and confidential. These measures include, by way of example, strict limitations on the dissemination of information on a need-to-know basis, the use of non-solicit and confidentiality agreements, the use of non-disclosure agreements, and the deployment of private databases to house the information.

84.    As a result of these security measures, Ravago's confidential and proprietary trade secret information is not available to, or easily ascertainable through proper means by, any third party, including the Vinmar Group.

85.     Ravago's confidential and proprietary trade secret information derives independent economic value from not being generally known to, or easily ascertainable by, another person who could obtain economic value from the disclosure of use of the information.

86.     In violation of Ravago's rights, the defendants misappropriated Ravago's confidential and proprietary trade secret information in the improper and unlawful manner described above. The defendants' misappropriation of Ravago's trade secrets was intentional, willful, and malicious. The defendants have attempted and continue to attempt to conceal their misappropriation.

87.     The individual defendants, through their employment at Ravago, acquired and had access to Ravago's trade secrets. The individual defendants were obligated by contract and applicable law to refrain from disclosing or using Ravago's trade secrets. The Vinmar Group and the individual defendants, knew that the individual defendants were subject to the duty to maintain the secrecy of Ravago's trade secrets. Nonetheless, the Vinmar Group and the individual defendants misappropriated and used Ravago's trade secrets for their benefit by acquiring them through improper means for use in competing with Ravago.

88.     As a direct and proximate result of the defendants' conduct, Ravago has been damaged – and if the defendants' conduct is not stopped, Ravago will continue to suffer severe competitive harm, irreparable injury, and significant damages.

89.     In addition to causing Ravago to suffer monetary damages, the defendants have caused Ravago to suffer damages for which it has no adequate remedy at law to protect it from the unlawful and continuing misappropriation, disclosure, or use of its trade secrets.

90.     Ravago has a substantial likelihood of success on the merits of this claim because of the defendants' misappropriation, disclosure, and use of Ravago's trade secrets.

91.     The threat of harm to Ravago in the absence of injunctive relief far outweighs the threat of harm to the defendants if an injunction is granted. Ravago faces substantial financial loss, loss of goodwill, and loss of its competitive position in the marketplace, whereas the only "hardship" imposed on the defendants would be to prevent them from reaping any illicit gain or benefit from the misappropriation, disclosure, and use of Ravago's trade secrets.

92.     The public interest would be served by granting the relief sought in that the public clearly favors preventing parties, such as the defendants, from profiting from unlawful and improper conduct.

WHEREFORE, Ravago respectfully requests judgment against the defendants as follows: (a) temporarily and permanently enjoining the defendants from using or disclosing any of Ravago's trade secrets; (b) awarding Ravago compensatory damages, including both actual loss and unjust enrichment, in an amount to be proven at trial, plus exemplary damages for the willful and malicious misappropriation; (c) awarding Ravago its attorneys' fees, costs, and pre and post judgment interest; and (d) granting such other relief as the Court deems just.

## COUNT III
## BREACH OF THE DUTY OF LOYALTY
## AGAINST THE INDIVIDUAL DEFENDANTS

93.     Ravago incorporates paragraphs one through thirty-six, thirty-eight through thirty-nine, forty-one through forty-two, forty-four through fifty-nine, and sixty-one through sixty-five.

94.     This is an action against the individual defendants for breach of their duty of loyalty to Ravago.

95.     As employees and executives of Ravago, the individual defendants owed Ravago a duty of loyalty, good faith, and honesty.

96.     Prior to their resignation from Ravago, the individual defendants breached their duty of loyalty to Ravago by engaging in disloyal acts in anticipation of future competition.

97.     These disloyal acts include, but are not limited to, (i) disclosing Ravago's confidential information to third parties, (ii) utilizing Ravago's confidential information for their own financial gain and for the benefit of the Vinmar Group, (iii) misappropriating Ravago's trade secrets, (iv) communicating with the Vinmar Group, a direct competitor of Ravago, regarding employment with the Vinmar Group, during the time period that they were employed by Ravago, (v) communicating with customers of Ravago for the purpose of competing with Ravago, during the time period that they were employed by Ravago, (vi) soliciting several of Ravago's employees to leave Ravago and go to the Vinmar Group, during the time period that they were employed by Ravago, and (vii) failing to properly and adequately perform their employment duties and obligations while still employed by Ravago in anticipation of their employment with the Vinmar Group, and in anticipation of competition against Ravago.

98.     As a result of the individual defendants' breaches of their duty of loyalty, Ravago has suffered damages. These damages include, but are not limited to, a present and future loss of profits which had to be reduced, or were lost, because of the conduct of the individual defendants, including Ravago's reduced productivity because of the individual defendants' failure to fulfill their employment obligations and attempts to solicit other employees to leave Ravago.

99.     Their actions were also inconsistent with their employment at Ravago and adverse to Ravago's financial and other business interests.

100.    The individual defendants' actions were willful and in reckless disregard of Ravago's rights and interests.

WHEREFORE, Ravago respectfully requests judgment against the individual defendants, Mr. Dmytruk, Mr. Siebenaller, and Mr. Ward, for damages, including punitive damages, pre and post judgment interest, costs, and such other relief as the Court deems just.

<u>COUNT IV</u>
**BREACH OF THE NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT AGAINST MR. DMYTRUK UNDER CONNECTICUT LAW**

101.    Ravago incorporates paragraphs one through sixty-five.

102.    Mr. Dmytruk executed the Non-Solicitation and Confidentiality Agreement on May 15, 2006. **Exhibit "A."** The agreement was assigned to Ravago in 2006 when it acquired Muehlstein. Section fourteen of the agreement contains an express provision allowing such assignment.

103.    Section three of the agreement prohibits Mr. Dmytruk from disclosing trade secrets and confidential information. Trade secrets are defined in the agreement, in part, as "any scientific or technical information, design, process, procedure, formula or improvement that is valuable and not generally known to [Ravago's] competitors. . ." Confidential Information is defined in the agreement, in part, as "any data or information and documentation, other than Trade Secrets, which is valuable to [Ravago] and not generally known to the public. . ."

104.    Section three of the agreement specifically states:

> The Employee agrees. . . that [he] will not, while employed by [Ravago] and for so long thereafter as the pertinent information or documentation remains a Trade Secret, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Trade Secret. The Employee further agrees . . . that [he] will not, while employed by [Ravago] and for two (2) years after [his] employment has ceased, disclose or disseminate to any other person, organization or entity or otherwise employ Confidential Information.

105.    Mr. Dmytruk breached, and continues to breach, his obligations under section three of the agreement, as described more specifically above, by disclosing Ravago's trade secrets and confidential information to its competitors, the Vinmar Group.

106.    Section four of the agreement requires Mr. Dmytruk to deliver all of his documents and computer files to Ravago at the termination of his employment. Mr. Dmytruk breached this section of the agreement by destroying files on his computer and iPhone, including files that were the property of Ravago. Mr. Dmytruk made searches on his computer for how to delete computer files from his computer and pictures from his phone prior to returning his computer and phone to Ravago.

107.    Section eight of the agreement specifically prohibits the solicitation of Ravago employees. It states, in pertinent part, "[t]he Employee agrees that while employed by [Ravago] and for eighteen (18) months after the conclusion of [his] employment [he] will not directly or indirectly recruit, hire or attempt to recruit or hire any other employee of [Ravago] with whom the Employee had contact during [his] employment with [Ravago]. Mr. Dmytruk breached, and is continuing to breach, this section of the agreement by directly and indirectly recruiting and attempting to recruit current Ravago employees, including the recruitment of Mr. Siebenaller and Mr. Ward.

108.    As a proximate result of Mr. Dmytruk's breaches, Ravago has been damaged.

WHEREFORE, Ravago respectfully requests judgment against Mr. Dmytruk for damages, pre and post judgment interest, attorney fees, costs, and such other relief as the Court deems just.

## COUNT V
## BREACH OF THE NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT AGAINST MR. WARD UNDER OHIO LAW

26

109.   Ravago incorporates paragraphs one through sixty-five.

110.   Mr. Ward executed the Non-Solicitation and Confidentiality Agreement on June 10, 2005. **Exhibit "C."** The agreement was assigned to Ravago in 2006 when it acquired Muehlstein. Section fourteen of the agreement contains an express provision allowing such assignment.

111.   Section three of the agreement prohibits Mr. Ward from disclosing trade secrets and confidential information. Trade secrets are defined in the agreement, in part, as "any scientific or technical information, design, process, procedure, formula or improvement that is valuable and not generally known to [Ravago's] competitors. . ." Confidential Information is defined in the agreement, in part, as "any data or information and documentation, other than Trade Secrets, which is valuable to [Ravago] and not generally known to the public. . ."

112.   Section three of the agreement specifically states:

> The Employee agrees. . . that [he] will not, while employed by [Ravago] and for so long thereafter as the pertinent information or documentation remains a Trade Secret, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Trade Secret. The Employee further agrees . . . that [he] will not, while employed by [Ravago] and for two (2) years after [his] employment has ceased, disclose or disseminate to any other person, organization or entity or otherwise employ Confidential Information.

113.   Mr. Ward breached, and continues to breach, his obligations under section three of the agreement, as described more specifically above, by disclosing Ravago's trade secrets and confidential information to its competitors, the Vinmar Group.

114.   Section four of the agreement requires Mr. Ward to deliver all of his documents and computer files to Ravago at the termination of his employment. Mr. Ward breached this section of the agreement by fully destroying all of the files on his computer, including files that

were the property of Ravago. Mr. Ward's computer was wiped completely clean by software Mr. Ward purchased prior to returning his computer to Ravago.

115.   Section eight of the agreement specifically prohibits the solicitation of Ravago employees. It states, in pertinent part, "[t]he Employee agrees that while employed by [Ravago] and for eighteen (18) months after the conclusion of [his] employment [he] will not directly or indirectly recruit, hire or attempt to recruit or hire any other employee of [Ravago] with whom the Employee had contact during [his] employment with [Ravago]. Mr. Ward breached, and continues to breach, this section of the agreement by directly and indirectly recruiting and attempting to recruit current Ravago employees.

116.   As a proximate result of Mr. Ward's breaches, Ravago has been damaged.

WHEREFORE, Ravago respectfully requests judgment against Mr. Ward for damages, pre and post judgment interest, attorney fees, costs, and such other relief as the Court deems just.

### COUNT VI
### BREACH OF THE TRADE SECRETS AND CONFIDENTIAL INFORMATION AGREEMENT AGAINST MR. SIEBENALLER UNDER CONNECTICUT LAW

117.   Ravago incorporates paragraphs one through sixty-five.

118.   Mr. Siebenaller executed the Trade Secrets and Confidential Information Agreement on September 5, 2009. **Exhibit "B."**

119.   Section two of the agreement prohibits Mr. Siebenaller from disclosing trade secrets and confidential information. Trade secrets are defined in the agreement as "any business information, method, technique, process, formula, pattern, device, drawing, cost data or customer list that is valuable to [Ravago] and not generally known to [Ravago's] competitors." Confidential Information is defined in the agreement as "any data, information or documentation, other than Trade Secrets, which are valuable to [Ravago] and not generally known to the public"

28

and "any data, information or documentation supplied to [Ravago] on a confidential basis by its customers or vendors."

120.    Section two of the agreement specifically states:

> Employee agrees. . . that [he] will not, while employed by [Ravago] and for so long thereafter as the pertinent information or documentation remains a Trade Secret or Confidential Information, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Trade Secret or Confidential Information.

121.    Mr. Siebenaller breached his obligations under section two of the agreement, as described more specifically above, by disclosing Ravago's trade secrets and confidential information to its competitors, the Vinmar Group.

122.    Section three of the agreement requires Mr. Siebenaller to deliver all of his documents and computer files to Ravago at the termination of his employment. Mr. Siebenaller breached this section of the agreement by destroying files on his computer, including files that were the property of Ravago.

123.    As a proximate result of Mr. Siebenaller's breaches, Ravago has been damaged.

WHEREFORE, Ravago respectfully requests judgment against Mr. Siebenaller for damages, pre and post judgment interest, attorney fees, costs, and such other relief as the Court deems just.

## COUNT VII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS AGAINST VINMAR, PREMIER, AND VPA

124.    Ravago incorporates paragraphs one through sixty-five.

125.    The Vinmar Group (Vinmar, Premier, and VPA) was aware of the individual defendants' contractual obligations to Ravago.

126.    The Vinmar Group induced or otherwise caused the individual defendants to breach their contractual obligations to Ravago by having them (i) disclose Ravago's trade secrets and other confidential information and (ii) solicit other Ravago employees for employment at the Vinmar Group.

127.    The actions of the Vinmar Group, as alleged above, were calculated and designed to impair, impede, and damage Ravago's legitimate business interests by unlawful means. The Vinmar Group's conduct is without justification and constitutes an unlawful, tortious, unfair, and intentional malicious interference with Ravago's contractual rights.

128.    The Vinmar Group's conduct constitutes a tortious interference with Ravago's contractual rights and, as a result, Ravago is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Ravago respectfully requests judgment against Vinmar, Premier, and VPA for damages, including punitive damages, pre and post judgment interest, costs, and such other relief as the Court deems just.

<u>**COUNT VIII**</u>
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS**
**AGAINST MR. DMYTRUK AND MR. SIEBENALLER**

129.    Ravago incorporates paragraphs one through thirty-six, thirty-eight through thirty-nine, forty-one through fifty-nine, and sixty-one through sixty-five.

130.    Mr. Dmytruk and Mr. Siebenaller were aware of Mr. Ward's, and other employees, contractual obligations to Ravago.

131.    Mr. Dmytruk and Mr. Siebenaller induced or otherwise caused Mr. Ward to breach his contractual obligations to Ravago by having him disclose Ravago's trade secrets and

other confidential information. Mr. Dmytruk and Mr. Siebenaller are also attempting to induce other Ravago employees to breach their contractual obligations to Ravago.

132.     The actions of Mr. Dmytruk and Mr. Siebenaller, as alleged above, were calculated and designed to impair, impede, and damage Ravago's legitimate business interests by unlawful means. Mr. Dmytruk and Mr. Siebenaller's conduct is without justification and constitutes an unlawful, tortious, unfair, and intentional malicious interference with Ravago's contractual rights.

133.     Mr. Dmytruk and Mr. Siebenaller's conduct constitutes a tortious interference with Ravago's contractual rights and, as a result, Ravago is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Ravago respectfully requests judgment against Mr. Dmytruk and Mr. Siebenaller for damages, including punitive damages, pre and post judgment interest, costs, and such other relief as the Court deems just.

## COUNT VIIII
## CIVIL CONSPIRACY TO INJURE A BUSINESS
## AGAINST ALL DEFENDANTS

134.     Ravago incorporates paragraphs one through thirty-six, thirty-eight through thirty-nine, forty-one through forty-two, forty-four through fifty-nine, and sixty-one through sixty-five.

135.     The defendants maliciously and unlawfully conspired to injure Ravago's business by agreeing to convert Ravago's trade secrets and confidential information to gain an unfair advantage over Ravago and by attempting to solicit Ravago employees to breach their duties to Ravago.

136.     The defendants acted in concert and conspired to breach the duty of loyalty owed by the individual defendants to Ravago.

137.    The defendants have acted in concert and conspired to tortuously interfere with Ravago's advantageous business and contractual relationships with its customers and employees.

138.    Towards that end, and as described above, the defendants acted in concert and conspired to misappropriate Ravago's trade secrets and confidential information and did, indeed, succeed in misappropriating Ravago's trade secrets and confidential information, soliciting Ravago employees, and using Ravago's confidential information to gain an unfair advantage.

139.    The object and purpose of the civil conspiracy was achieved by unlawful means – the misappropriation of trade secrets. As a direct and proximate result of the defendants' conspiracy, Ravago has been damaged.

WHEREFORE, Ravago respectfully requests judgment against the defendants for damages, including punitive damages, pre and post judgment interest, costs, and such other relief as the Court deems just.

*/s/ Michael D. Crosbie*
**MICHAEL D. CROSBIE, ESQ.**
Florida Bar No. 72575
mcrosbie@shutts.com
**MICHAEL L. GORE, ESQ.**
Florida Bar No. 441252
mgore@shutts.com
**NICOLE L. BALLANTE, ESQ.**
Florida Bar No. 125356
nballante@shutts.com
**SHUTTS & BOWEN LLP**
300 S. Orange Ave., Suite 1600
Orlando, Florida 32801
Telephone: 407-835-6796
Fax: 407-849-7275
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 18, 2018, I electronically filed the foregoing with the Clerk of the Court which will send a notice of electronic filing to all counsel of record.

<u>/s/ Michael D. Crosbie</u>
Michael D. Crosbie, Esq.

TPADOCS 22295511 1